IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

AVUS DESIGNS, INC.,

Plaintiff,

VS.                                              Case No. 22-CV-0173-SWS

GREZXX, LLC,

Defendant,

## ORDER GRANTING MOTION FOR DEFAULT JUDGMENT

This matter comes before the Court on the *Redacted Motion for Default Judgment* (ECF No. 9) filed by Plaintiff Avus Designs, Inc. ("Avus"). A hearing on the motion was held on November 4, 2022. (*See* ECF Nos. 18–19.) At the Court's request Avus further supplemented the record on November 18, 2022. (ECF No. 20.) Having reviewed the motion, materials submitted in support thereof, and otherwise being fully advised, the Court finds the motion should be GRANTED and ORDERS as follows.

### BACKGROUND

Avus is a company organized under the laws of California with a principal place of business in Santa Barbara, California. (ECF No. 1 ¶2.) Defendant Grezxx, LLC ("Grezxx") is a Wyoming limited liability company ("LLC") with its principal office in Sheridan,

Wyoming.[1] (*Id.* ¶ 3.) Avus is the exclusive licensee of all right, title, and interest in U.S. Patent No. 7,513,856 (the "Patent") for a weight plate retention collar. (*Id.* ¶ 7–8.) The Patent is valid and enforceable. (*Id.*)

The Patent relates to a retention collar for securing weights to a barbell. (*Id.* ¶9.) Avus launched the weight collar product in 2006, and the Patent was issued by the United States Patent and Trademark Office on April 7, 2009. (*Id.* at ¶7, 16.) Avus sells its products covered by the Patent on various online platforms—including Amazon.com ("Amazon")— its own website, and in brick-and-mortar retail outlets. (*Id.* ¶ 16.)

Grezxx sells its product that infringes on the Patent under the name Greententljs ("Infringing Product") online via its Amazon storefront. (*Id.* ¶18.) Grezxx allegedly designed the Infringing Product after seeing Avus' products covered by the Patent. (*Id.* ¶20.) Avus alleges Grezxx has infringed, either literally or under the doctrine of equivalents, by manufacturing, offering to sell, and selling Infringing Products covered by one or more claims of the Patent. (*Id.* ¶26.) Additional facts relevant to Avus' claim will be discussed throughout.

## DISCUSSION

### A.    Legal Standard

In a patent case, the court applies the law of the Federal Circuit to substantive patent issues, and the law of its regional circuit to procedural non-patent issues. *In re Cambridge*

---

[1] *See Grezxx LLC*, Wyoming Secretary of State Business Center, https://wyobiz.wyo.gov/Business/FilingDetails.aspx?eFNum=102001024200060063028123016006069243054089101105 (last visited Nov. 21, 2022).

*Biotech Corp.*, 186 F.3d 1356, 1368 (Fed. Cir. 1999); *see Front Row Tech., LLC v. NBA Media Ventures, LLC*, 204 F.Supp.3d 1190, 1220 n.15 (D.N.M. 2016). Because the decision to enter default judgment is not unique to patent cases, this Court follows Tenth Circuit law. *See Iowa State Univ. Rsch. Found., Inc. v. Greater Continents, Inc.*, 81 F.App'x 344, 347 (Fed. Cir. 2003).

Motions for default judgment are governed by Fed. R. Civ. P. 55(b). Following entry of default by the Clerk of Court, a defendant may not defend a claim on the merits and the well-pleaded factual allegations in the complaint are taken as true. *Olcott v. Del. Flood Co.*, 327 F.3d 1115, 1125 (10th Cir. 2003). The court also accepts as true the undisputed facts alleged in affidavits and exhibits. *Malluk v. Berkeley Highlands Prods., LLC*, No. 19-CV-01489-CMA, 2020 WL 1033339, at *2 (D. Colo. Mar. 3, 2020). While factual allegations relating to liability are taken as true, allegations relating to the amount of damages are not. *Villanueva v. Acct. Discovery Sys., LLC*, 77 F.Supp.3d 1058, 1075 (D. Colo. 2015) (citing *Dundee Cement Co. v. Howard Pipe & Concrete Prods. Inc.*, 722 F.2d 1319, 1323 (7th Cir.1983)). The default judgment must be supported by a sufficient basis in the pleadings. *Tripodi v. Welch*, 810 F.3d 761, 764 (10th Cir. 2016).

Default judgment cannot be entered until the amount of damages has been ascertained. *Malluk*, 2020 WL 1033339, at *2. Damages may only be awarded if the record adequately reflects the basis for the award via a hearing or a demonstration by detailed affidavits establishing the necessary facts. *Id.* (citing *Hermeris, Inc. v. McBrien*, No. 10-2483-JAR, 2012 WL 1091581, at *1 (D. Kan. Mar. 30, 2012) (cleaned up).

Prior to entering default judgment, a court must determine whether it has jurisdiction over a defendant. *Marcus Food Co. v. DiPanfilo*, 671 F.3d 1159, 1169–70 (10th Cir. 2011) (citing *Dennis Garberg & Assocs., Inc. v. Pack-Tech Int'l Corp.*, 115 F.3d 767, 771 (10th Cir. 1997)). Decisions to enter default judgment are committed to the district court's sound discretion. *Garberg*, 115 F.3d at 771.

## B.      Jurisdiction and Entry of Default

When addressing jurisdiction, the court must assess adequacy of service of process, subject matter jurisdiction, and personal jurisdiction.

### i.      Service of Process and Subject Matter Jurisdiction

The Court analyzes adequacy of service of process on an LLC in the context of Fed. R. Civ. P. 4(h), which establishes service of process for a corporation, partnership, or association. *See Kuberski v. Cred X Debt Recovery, LLC*, No. 11-cv-03247, 2012 WL 2943726, at *4 (D. Colo. July 2, 2010). Rule 4(h) provides that service on a corporation, partnership, or association is adequate if effected "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process . . ." Fed. R. Civ. P. 4(h)(1)(B). Here, the Complaint and summons were delivered to Northwest Registered Agent Service, Inc. in Sheridan, Wyoming on August 9, 2022. (ECF No. 5 at 1.) According to the Wyoming Secretary of State, Northwest Registered Agent Service, Inc. is the registered agent for Grezxx.[2] The Court therefore finds service of process was appropriate.

---

[2] *See supra*, note 1.

The Court further finds it has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1338(a). *Marcus Food Co.*, 671 F.3d at 1169–70.

### ii.    Personal Jurisdiction

Before proceeding further, the Court pauses to confront a vexing issue that continuously presents itself when analyzing personal jurisdiction over LLCs. Namely, when may a court exercise general personal jurisdiction over an LLC even if specific personal jurisdiction may be lacking?

It is long established that the Fourteenth Amendment limits the personal jurisdiction of state courts. *Bristol-Meyers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.*, 137 S.Ct. 1773, 1779 (2017). By virtue of Fed. R. Civ. P. 4(k)(1)(A), federal courts ordinarily follow state law in determining the bounds of their personal jurisdiction. *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). Like many states, the Wyoming "long arm" statute authorizes the state's courts to exercise personal jurisdiction "on any basis not inconsistent with the Wyoming or United States Constitution." WYO. STAT. § 5-1-107(a); *see H&P Advisory Ltd. v. Randgold Resources Ltd.*, 465 P.3d 433, 437 (Wyo. 2020).

It is also well established there are two primary varieties of personal jurisdiction: "general personal jurisdiction" (sometimes called "all-purpose") and "specific personal jurisdiction" (sometimes called "case-linked"). *Bristol-Meyers Squibb*, 137 S.Ct. at 1779–80. A court with general jurisdiction may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different state. *Id.* (citing *Goodyear Dunlap Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). Conversely, specific jurisdiction requires an "affiliation between the forum and the underlying controversy,

principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the state's regulation." *Id.* (citing *Goodyear*, 564 U.S. at 919)) (emphasis omitted). Put another way, the suit must "arise out of or relate to the defendant's contacts with the forum [state]." *Daimler*, 571 U.S. at 127.

Since the Supreme Court's canonical decision in *Int'l Shoe Co. v. Washington*, 326 U.S. 210 (1945), "specific jurisdiction has become the centerpiece of modern jurisdiction theory, while general jurisdiction [has played] a reduced role." *Daimler*, 571 U.S. at 128. Under *Int'l Shoe's* well recognized standard, a State may authorize its courts to exercise personal jurisdiction over a defendant if the defendant has "certain minimum contacts with [the State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* at 126 (quoting *Int'l Shoe*, 326 U.S. at 317). The contacts needed for specific personal jurisdiction often go by the name "purposeful availment," and must include the defendant taking "some act by which it purposefully avails itself to the privilege of conducting activities within the forum state." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S.Ct. 1017, 1024–25 (quoting *Burger King Corp. v. Rudezewicz*, 471 U.S. 462, 475; *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). While the Supreme Court has consistently held there must be a connection between the contacts and the suit, it has rejected a strict causation-only approach, instead emphasizing the suit must "arise out of or relate to the defendant's contacts with the forum." *Ford*, 141 S.Ct. at 1026.

In cases such as this—involving an LLC selling products through an online marketplace—application of the specific personal jurisdiction analysis is particularly

enigmatic. The jurisdictional allegations in the Complaint are limited to a single paragraph, and are largely vague and conclusory:

> 5. This Court has general personal jurisdiction over GREZXX because GREZXX is a Wyoming entity and has its principal place of business in Wyoming. Moreover, this Court has specific jurisdiction over GREZXX because a substantial portion of the events giving rise to the claim occurred within this District, the Defendant has committed acts on infringement in and has significant contacts within the District, and is infringing on Avus's intellectual property in its product listing targeted at this District and/or are using, selling, or offering to sell the infringing product in this District.

(ECF No. 1 ¶ 5.) There are no factual allegations that Grezxx has ever sold an Infringing Product in Wyoming, or any further explanation regarding Grezxx's "significant contacts" with Wyoming. Avus has provided no specific information regarding Grezxx's "product listing targeted at this District." Indeed, courts within the Tenth Circuit have recognized "[c]onclusory allegations as to the transaction of business, devoid of further factual support, are insufficient to establish a good faith basis for personal jurisdiction over a defendant." *Ryuunosuke Takeshige v. Rich Broad. LLC*, No. 20-CV-1262-WJM-KLM, 2021 WL 2351036, at *1–2 (D. Colo. June 9, 2021) (citing *Daimler*, 571 U.S. at 117).

Based on the allegations, the Court is left to wonder whether Grezxx truly "purposefully availed" itself to the privileges of conducting business in Wyoming, or whether the allegations only vaguely establish Grezxx listed its products for sale on Amazon—a site accessible virtually anywhere in the world. There are no factual allegations that Grezxx ever specifically targeted Wyoming residents for sales, or specifically advertised within the state. As such, based on the record the Court cannot definitively conclude it has specific personal jurisdiction over Grezxx.

The peril of the Court's position finds robust company in the Supreme Court's personal jurisdiction jurisprudence. The Supreme Court has remained sharply divided as to whether merely placing goods in the "stream of commerce" within a state subjects an entity to specific personal jurisdiction. *See e.g., Asahi Metal Indus. Co., Ltd. v. Superior Ct. of Cal.*, 480 U.S. 102 (1987); *see generally* 4 CHARLES ALLEN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.4 (4th ed. 2022). In *Asahi*, a plurality of justices, led by Justice O'Conner, took the position "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed towards the forum state." *Id.* at 112. Justice O'Conner concluded "additional conduct" was needed to satisfy the purposeful availment standard, such as "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id.*

Justice Brennan, joined by Justices Blackmun, Marshall, and White, took a different view of the "stream of commerce" theory in *Asahi*, arguing a defendant should be subject to jurisdiction whenever "the regular and anticipated flow of products"—as opposed to "unpredictable currents or eddies"—leads the product into the forum state. *Id.* at 117 (Brennan, J., concurring). With no majority of justices joining either opinion, the exact parameters of the "stream of commerce theory" remained unclear.

Over twenty years later, the Court once again paddled into the stream of commerce in *J McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011). Like *Asahi*, no opinion garnered a majority. Justice Kennedy, joined by Chief Justice Roberts, and Justices Scalia

8

and Thomas, characterized the principal inquiry as "whether the defendant's activities manifest an intention to submit to the power of a sovereign," as demonstrated by "purposefully availing itself of the privileges of conducting activities within the forum state." *Id.* at 882 (quoting *Hanson*, 357 U.S. at 253). Justice Kennedy conceded sometimes this could be done by sending goods—rather than agents—into a forum state, but such transmission of goods could only confer jurisdiction when the defendant *targeted* the forum state, not just *predicted* the goods might reach the forum state. *Id.* at 882. The opinion made clear it was the defendant's actions—not his expectations—that subjects it to jurisdiction. *Id.* at 883.

Writing in dissent, Justice Ginsburg, joined by Justices Sotomayor and Kagan, took a much larger view, arguing a foreign manufacturer had—by engaging a U.S. distributor to promote and sell its machines in the United States—"'purposefully availed itself' of the United States market nationwide, not a market in a single state . . ." *Id.* at 905 (Ginsburg, J., dissenting). Under this view, a defendant would be subject to jurisdiction in *any* state where the products were sold by the distributor where they subsequently caused injury. *Id.* at 906.

Providing the deciding votes against jurisdiction, Justice Breyer—joined by Justice Alito—wrote a much narrower concurrence that took a limited view of the factual record. Justice Breyer found the unilateral act of an independent intermediary reselling a single item cannot suffice to confer jurisdiction. *Id.* at 888 (Breyer, J., concurring). Relying on precedent—including the *Asahi* opinions—Justice Breyer noted no regular course of sales in the forum state, nor "something more" such as advertising, advice, marketing, or

anything else were present to confer jurisdiction. *Id.* at 889. Because *Nicastro* did not produce a majority opinion, many lower courts have followed Justice Breyer's concurrence as the narrowest holding among the plurality opinion. *See e.g., AFTG-TG, LLC v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1363 (Fed. Cir. 2012) (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)). In essence, Justice Breyer concluded nothing changed following *Nicastro*, and the conflicting articulations of the "stream of commerce theory" from *Asahi* remain controlling law. *Id.*

Here, the factual allegations point to nothing more than Grezxx placing the Infringing Product into the stream of commerce. While the Complaint alleges Grezxx "targeted" Wyoming, it provides no factual allegations to back up this assertion. Under any articulation of the stream of commerce test in *Asahi*, the allegations are insufficient. While it is clear Grezxx placed the Infringing Product into the stream of commerce, there is no "additional conduct" alleged to satisfy the test under Justice O'Conner's formulation. Avus has not alleged Grezxx designed the Infringing Product to market in Wyoming, there are no allegations Grezxx actively advertised the Infringing Product in Wyoming, there are no allegations Grezxx established channels for provided advice to Wyoming consumers, and there is no indication Amazon—or anyone else—agreed to market the product as a "sales agent" in Wyoming. *Asahi*, 480 U.S. at 112 (O'Conner, J., plurality opinion).

There are also insufficient allegations to demonstrate it was the intention of Grezxx to target sales of the Infringing Product at Wyoming. Indeed, it seems just as likely—absent further allegations—that "unpredictable currents or eddies" carried the Infringing Product into Wyoming. *Asahi*, 480 U.S. at 117 (Brennan, J., concurring).

Perhaps the only opinion that would confer specific jurisdiction would be Justice Ginsburg's dissent in *Nicastro*. The allegations in the Complaint are likely sufficient to demonstrate Grezxx engaged Amazon to distribute its products within the entirety of the United States—including in Wyoming. Under Justice Ginsburg's formulation, Grezxx would likely be subject to specific personal jurisdiction in Wyoming, having availed itself to jurisdiction nationwide. *Nicastro*, 564 U.S. at 906 (Ginsburg, J., dissenting). Yet, because the dissent does not control, the Court must find Grezxx is not subject to its specific personal jurisdiction.

However, that is not the end of the story. While it may find less ink in the volumes of *United States Reports*, the doctrine of general personal jurisdiction emerges from the shadows in cases such as this.

The Supreme Court has made clear only a limited set of affiliations with a forum state subject a defendant to general personal jurisdiction there. *Daimler*, 571 U.S. at 137 (citing *Goodyear*, 564 U.S. at 923). In the corporation sense, the proper inquiry is whether a corporation's "affiliations with the forum state are so 'continuous and systematic' as to render it essentially *at home* in the forum state." *Id.* at 139 (emphasis added). Both *Goodyear* and *Daimler* identified the place of incorporation and principal place of business as "paradigm" bases for general personal jurisdiction for corporations. *Id.* The Court noted "[t]hose affiliations have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable." *Id.* at 137. The Supreme Court has clarified general jurisdiction is not limited to those forums, but in an "exceptional case" a corporate

defendant's operation may be "so substantial and of such a nature as to render the corporation at home in that State." *BNSF Ry. Co. v. Tyrell*, 137 S.Ct. 1549, 1558 (2017).

What has yet to be explicitly resolved is whether the standards for finding a corporation "at home" under *Daimler, Goodyear,* and *BNSF* apply equally to other business entities. As the Fifth Circuit recently observed, neither the Supreme Court nor a circuit court of appeals has directly addressed whether the type of artificial entity—including an LLC—affects the "at home" analysis, while acknowledging courts routinely apply the analysis to entities besides corporations. *Frank v. P N K (Lake Charles) L.L.C.*, 947 F.3d 331, 338 n.10 (5th Cir. 2020) (collecting cases).

Complicating this matter further are a pair of recent Tenth Circuit decisions explicitly finding LLCs are *not* treated as corporations for the purposes of establishing diversity jurisdiction. *See Mgmt. Nominees, Inc. v. Alderney Inv., LLC*, 813 F.3d 1321, 1324 (10th Cir. 2016); *Siloam Springs Hotel, L.L.C. v. Century Surety Co.*, 781 F.3d 1233, 1237 (10th Cir. 2015). In *Alderney,* the court found LLCs are "unincorporated associations" for the purposes of diversity and federal courts must include all the entities' members when determining citizenship, and only those entities that are "corporations in the *traditional understanding* of that word will be treated as a person for the purposes of diversity jurisdiction." *Alderney*, 813 F.3d at 1324 (emphasis in original). The court specifically declined to consider whether a Wyoming LLC was sufficiently "corporation like" to be treated as a "person" for the purposes of diversity jurisdiction, and instead determined citizenship based on each of the entities' members. *Id.* at 1325 (citing *Carden v. Arkoma Assocs.*, 494 U.S. 185, 197 (1990)).

12

Thus, this Court recognizes the tension between treating an LLC like a corporation for general personal jurisdiction purposes, and the Tenth Circuit's explicit pronouncement in *Alderney* that an LLC is *not* a corporation for the purposes of diversity jurisdiction. However, given the Supreme Court's pronouncement in *Daimler* and the underlying policy justifications, the distinction is appropriate. The Court therefore holds an LLC is "at home" in its state of organization, and is therefore subject to general personal jurisdiction within that state consistent with the Due Process Clause. *Daimler*, 571 U.S. at 139.

As an initial matter, the Tenth Circuit's holdings in *Alderney* and *Siloam Springs Hotel* are distinguishable from today's ruling. As was apparent from the Tenth Circuit's analysis, *Alderney* is a statutory interpretation of the diversity jurisdiction statute, 28 U.S.C. § 1332(a), while today's ruling is premised upon the Due Process Clause. *See Alderney*, 813 F.3d at 1323–24. The statute itself speaks of the "citizenship" of persons and specifically provides "a corporation shall be a citizen of every State and foreign state by which it has been incorporated . . ." 28 U.S.C. § 1332(a), (c)(1). For the purposes of diversity jurisdiction, an individual is a citizen of a state if the person is domiciled there. *Middleton v. Stephenson*, 749 F.3d 1197, 1200. And, a person acquires domicile in a state by residing there and intending to remain indefinitely. *Id.* Not coincidentally, the identical standard—an individual's domicile—also subjects them to general personal jurisdiction in that state. *See Daimler*, 571 U.S. at 137. This standard has the benefit of identifying *a single, unique place* where an individual is always subject to jurisdiction.

However, applying *Alderney's* logic in the general personal jurisdiction context for an LLC flips this proposition on its head. By analyzing where an LLC is "at home" the

same way a court analyzes its "citizenship" under the diversity statute, the list of places where an LLC is subject to general jurisdiction vastly *increases*, smacking of judicial overreach. For instance, an LLC can only be organized in *one* place. By contrast, an LLC may have members in numerous states, therefore subjecting it to general jurisdiction in places where it has no contacts beyond the domicile of a single member. This surely cannot amount to the kind of "continuous and systematic" contacts envisioned in *Daimler*. Practically, an LLC can hardly be said to be "at home" in numerous states scattered all over the country. Such a result in untenable on its face.

Applying the logic of *Alderney* to the general personal jurisdiction context for LLC's presents an additional practical problem. Like several other states, the Wyoming Limited Liability Company Act does not require public disclosure of a LLC's members. *See* WYO. STAT. § 17-29-101, et seq. Given the anonymity, not subjecting an LLC to general jurisdiction in its state of organization runs contrary to one of *Daimler*'s central commands: that plaintiffs have "at least one clear and certain forum in which a corporate defendant may be sued on any and all claims." *Daimler*, 517 U.S. at 137. Rather than conduct extensive discovery to identify members prior to even filing suit (assuming such a task is even possible), subjecting an LLC to general jurisdiction in its state of organization affords plaintiffs this ability.

Of course, if the members of the LLC *remain* completely anonymous, following the *Alderney* approach yields a completely unacceptable result: if the LLC is not subject to general jurisdiction in its state of organization and instead only by virtue of its member's

citizenship, it may well not be subject to jurisdiction anywhere.[3] Providing plaintiffs with

*no* available forum for redress is inconsistent with personal jurisdiction jurisprudence. As

this Court recently observed,

> The absence of an allegation by [plaintiff] as to the citizenship of
> [defendant's] members is unfortunately a function, or more accurately a
> dysfunction, of the Wyoming Limited Liability Company Act (hereinafter
> "Wyoming Act"), WYO. STAT. §§ 17–29–101 et seq. Regrettably, and
> probably intentionally, the Wyoming Act does not require the identification
> or registration of any individuals, members or managers of a Wyoming LLC.
> This "feature" has in turn created many undesirable problems, not just
> limited to this Court's. See JANE G. GRAVELLE, CONG. RSCH. SERV.,
> R40623, TAX HAVENS: INTERNATIONAL TAX AVOIDANCE AND
> EVASION 7–10, 29 (2022). Given the legal analysis required for
> determining jurisdiction, enabling anonymity of Wyoming LLCs' members
> creates an absolute nightmare for Federal Courts in sorting out their place(s)
> of citizenship, which are determinative of whether they have subject matter
> and personal jurisdiction. That being said, in this case, it does not appear this
> Court lacks subject matter jurisdiction for several reasons and further,
> Defendant has waived any objection to personal jurisdiction.

*B.V. Reomie Automateriaal v. IDE Invest and Real Estate, LLC*, No. 22-CV-00091-SWS,

2022 WL 16901968, at *2 (D. Wyo. Nov. 11, 2022). With Grezxx not having waived

objection to personal jurisdiction, today is the day to conclude the Court has general

personal jurisdiction over it based on *Daimler*.

Today's holding subjecting an LLC to general jurisdiction in its state of organization

finds support in other personal jurisdiction doctrines. For instance, although not a universal

proposition, some courts have found that by merely registering to do business in a state

---

[3] This is not to say an LLC is not also subject to general jurisdiction in the state of its principal place of business. *See Daimler*, 571 U.S. at 137. However, determining the principal place of business absent knowledge of a LLC's members may prove difficult in practice. The Supreme Court has suggested—though never determined—the principal place of business for purposes of personal jurisdiction should be determined using the "nerve center" test from *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010). *Daimler*, 571 U.S. at 137.

even a *foreign* corporation is subject to the general personal jurisdiction of the state's courts. *See generally* Tanya J. Monestier, *Registration Statutes, General Jurisdiction, and the Fallacy of Consent*, 36 CARDOZO L. REV. 1343, 1372–80 (2015) (noting cases).[4] Like all states, Wyoming requires both domestic and foreign LLC's to continually maintain a registered office and registered agent within the state. *See* WYO. STAT. § 17-29-113, 114; § 17-16-1507.

The majority of courts upholding registration conferring general jurisdiction have done so based on the theory of consent. *See Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982) (noting a defendant may voluntarily consent or submit to the jurisdiction of a court). For instance, the Eighth Circuit found, "[o]ne of the most solidly established ways of giving [consent to jurisdiction] is to designate an agent for service of process within the State." *Knowlton v. Allied Van Lines, Inc.*, 900 F.2d 1196, 1199 (8th Cir. 1990). The court reasoned, "[t]he whole purpose of requiring designation of an agent for service is to make a nonresident suable in the local courts." *Id.* It should be further noted that *Knowlton* involved a *foreign* corporation—a Delaware corporation with a principal place of business in Illinois—that appointed a registered agent in Minnesota. *Id.* at 1197–98.

Although *Knowlton* was decided before *Daimler* clarified the standards for general personal jurisdiction, its underlying reasoning supports today's ruling—especially

---

[4] To be clear, Professor Monestier argues *against* this proposition: "the assertion of general jurisdiction over corporations based on their registration to do business and appointment of an agent for service of process offends the Due Process Clause and cannot be sustained as a jurisdictional practice." *Id.* at 1371.

considering *Knowlton* dealt with a *foreign* corporation, not a domestic corporation organized under Minnesota's laws. Much like Minnesota, Wyoming's requirement that an LLC appoint a registered agent serves but a single purpose: so that it may be sued in the local courts. By agreeing to be organized under the state's LLC law and having an agent present in that state to receive process—i.e., to be sued—there is a strong implication of consent to jurisdiction. Of course, this Court need not decide if consent via registration alone is enough to confer general jurisdiction, but the underlying principle lends strong support to subjecting a domestic LLC to general jurisdiction in its state of organization.

Today's ruling also finds some support in other contemporary personal jurisdiction jurisprudence. In a limited number of instances, courts have reasoned when a foreign corporation has a registered agent in a state they are "present" in the forum state for the purposes of personal jurisdiction. *See e.g., Allied Signal, Inc. v. Purex Indus., Inc.*, 576 A.2d 942, 945 (N.J. Super. Ct. App. Div. 1990). The *Allied Signal* court's reasoning was based largely on Justice Scalia's plurality opinion in *Burnham v. Sup. Ct. of Cal., Cnty. Of Marin*, 495 U.S. 604 (1990), which held in-state personal service on an individual was sufficient to confer personal jurisdiction. The *Allied Signal* court had little trouble applying this "tag jurisdiction" principal to corporations. 576 A.2d at 944.

Yet, most courts have rejected the notion that tag jurisdiction applies to corporations. *See Martinez v. Aero Caribbean*, 764 F.3d 1062, 1067 (9th Cir. 2014). In *Martinez*, the court rejected the proposition that in-state service of process on a corporate officer was sufficient to confer jurisdiction over the corporation. *Id.* The court reasoned while historical principles dictated "courts of a State have jurisdiction over nonresidents

who are physically present in the State," because a corporation may be in "some abstract sense 'present' wherever its officers do business, such presence is not physical in a way contemplated by *Burnham*." *Id.* at 1068 (quoting *Burnham*, 495 U.S. at 617–19 (noting the physical presence required for tag jurisdiction and the "purely fictional" concept of constructive "presence" though business contacts are not the same)).

Nonetheless, cases such as *Martinez* and *Burnham* do not foreclose today's ruling. Of course, jurisdiction in the present case is not predicated on tag jurisdiction, although the record reveals Grezxx was served via their registered agent in Wyoming. (ECF No. 5.) Neither *Martinez* nor *Burnham* considered the effect of serving a registered agent on a *domestic* business entity. Rather, both cases involved service of process on a *foreign* entity or individual. Assuming *Martinez* is correct—and this Court has no reason to doubt that it is—and tag jurisdiction does not apply to serving foreign corporate officers, it says nothing regarding serving a domestic LLC's registered agent conferring jurisdiction. If anything, a corporation—or LLC in this matter—is much more "physically present" in its state of organization than when a member is conducting business in a foreign state. While tag jurisdiction via service on a registered agent is not in any way dispositive, the reasoning underlying cases such as *Allied Signal*, *Martinez*, and even *Burnham* certainly do not foreclose—and in many ways, supports—today's ruling.[5]

---

[5] Other cases may further support tag jurisdiction over an LLC. For instance, the Second Circuit allowed general jurisdiction over a partnership based on in-state service of a partner. *See First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16 (2d Cir. 1998). Because a partnership varies significantly from a corporation or an LLC, the Court does not address *First Am.* here.

Numerous policy considerations also support conferring general jurisdiction over an LLC in its state of organization. Cited by the Supreme Court in both *Daimler* and *Goodyear*, Professor Lea Brillmayer's policy justifications for corporations apply equally as strong to LLC's. *See* Brillmayer, Haverkamp, & Logan, *A General Look at General Jurisdiction*, 66 TEX. L. REV. 721, 733–34 (1988). First, much like a corporation, an LLC intentionally chooses to create a relationship with the state of organization, "presumably in part to obtain the benefits of that state's substantive and procedural laws." *Id.* Second, a LLC, like a corporation, cannot ever be absent from the state of incorporation. *Id.* Third, even if the LLC neither does business nor maintains an office in the state of organization, the organization process provides at least some notice of the potential for jurisdiction. *Id.* Finally, the LLC is likely to be familiar with the organizing state's laws, having just organized there. *Id.* These same policy considerations the Supreme Court considered in *Daimler* are salient when considering jurisdiction over an LLC.

Finally, the Supreme Court may have already implicitly answered the question now before this Court. One of the entities at the center of *Daimler* was Mercedes-Benz USA, LLC ("MBUSA"), a subsidiary of Daimler the Court stated was "incorporated" in Delaware with its principal place of business in New Jersey.[6] *Daimler*, 571 U.S. at 121. While the *Daimler* opinion speaks of "corporations," MBUSA itself is not a corporation—

---

[6] The jurisdictional issue in *Daimler* was two-fold: did Mercedes-Benz USA, LLC have contacts sufficient to subject it to general personal jurisdiction in California; and could those contacts be attributed to Daimler (its parent corporation) via an agency theory for wrongful conduct that occurred in Argentina. *See id.* at 121–22.

it is an LLC organized in Delaware.[7] The Court seemed to recognize this, both identifying MBUSA as an LLC and referring to it as a "Delaware limited liability corporation." *Id.* at 121, 123. Because Daimler failed to object to the plaintiff's assertion MBUSA would be subject to general jurisdiction in California, the Court simply assumed—for the purposes of the decision only—MBUSA *was* in fact subject to such jurisdiction. *Id.* at 134. Therefore, the issue directly before the Court was whether if Daimler's individual contacts with California—including the imputed contacts of MBUSA on an agency theory—were sufficient to subject Daimler to general personal jurisdiction there.[8] *Id.* at 133–34.

While the opinion identifies corporations' "paradigm bases for general jurisdiction," and the question of MBUSA being "at home" in California was not directly at issue, the Court nonetheless analyzes MBUSA's status as if it were a corporation. *Id.* at 139 ("Here, neither Daimler nor MBUSA is incorporated in California, nor does either entity have its principal place of business there.") Given the articulated standards and its apparent acknowledgment MBUSA is an LLC, the Supreme Court has at least strongly *implied* LLCs should be analyzed the same way as corporations for the purposes of general jurisdiction.

In sum, based on the constitutional standards announced in *Daimler* and supported by both ancillary personal jurisdiction doctrines and sound policy considerations, the Court holds an LLC is "at home" in its state of organization for the purposes of general personal

---

[7] *See Entity Details: Mercedes-Benz USA, LLC*, Delaware Dept. of State: Division of Corporations, https://icis.corp.delaware.gov/ecorp/entitysearch/NameSearch.aspx (last visited Nov. 22, 2022).
[8] The Court ultimately concluded even if it assumed MBUSA was at home in California and imputed its contacts to Daimler, "there would still be no basis to subject Daimler to general jurisdiction in California." *Id.* at 136.

jurisdiction, as is consistent with the Due Process Clause.[9] *Daimler*, 571 U.S. at 139. Because Grezxx is an LLC organized under Wyoming law, it is subject to this Court's general personal jurisdiction.

### iii.  Entry of Default

Grezxx was required to serve an answer or response to the Complaint within 21 days after the date of service. *See* Fed. R. Civ. P. 12(a)(1). Grezxx's deadline to plead or defend expired August 21, 2022, with no response to the Complaint. The Clerk of Court properly entered default against Grezxx on September 1, 2022. (ECF No. 8.) As of this date, Grezxx has not made an appearance or otherwise responded to the Complaint or the Motion for Default Judgment. Based on these facts, entry of default judgment is procedurally proper.

### C.  Default Judgment: Sufficiency of Facts in the Complaint

The Court accepts the well-pleaded factual allegations relating to liability contained in the Complaint as true. The only remaining question regarding liability is whether the allegations establish a valid patent infringement claim.

A party is liable for patent infringement when, without authorization, "makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent." 35 U.S.C. § 271(a). A determination of infringement requires a two-step analysis: (1) the court determines the scope and meaning of the claims asserted; and (2) the properly construed claims are

---

[9] Today's ruling expresses no opinion—nor is it intended to cast doubt—on other means of conferring general personal jurisdiction over a LLC, such as in its principal place of business, or the standards for making such a determination. *See Daimler*, 571 U.S. at 137.

compared to the allegedly infringing device. *Niazi Licensing Corp. v. St. Jude Medical S.C., Inc.*, 30 F.4th 1339, 1350 (Fed. Cir. 2022).

Under the first step—claim construction—the court must construe the asserted claims to ascertain their meaning and scope. *Netgear, Inc. v. Ruckus Wireless, Inc.*, 5 F.Supp.3d 592, 602 (D. Del. 2013) (citing *Cybor Corp. v. FAS Techs.* ˌ138 F.3d 1448, 1454 (Fed. Cir. 1998).

For claim construction purposes, language in the claim is generally given the meaning it naturally holds to a "person of ordinary skill in the art." *See* 35 U.S.C. § 103(a). The Federal Circuit has explained:

> The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation. That starting point is based on the well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art. Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). A court should use intrinsic evidence—meaning the patent document—to assist in construction of the claims, bearing in the mind the claims, not the written description, define the scope of the patent right. *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998).

Literal infringement requires a party to perform each and every step or element of a claimed product. *Netgear, Inc.*, 5 F.Supp.3d at 602. If any claim limitation is absent from the accused device, there is no literal infringement. *Id.*

A product that does not literally infringe may still infringe under the doctrine of equivalents "if the differences between an individual limitation of the claimed invention and an element of he accused product are insubstantial." *Netgear, Inc.*, 5 F.Supp.3d at 602 (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 24 (1997)). Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson*, 520 U.S. at 21, 29. However, the "determination of equivalence should be applied as an objective inquiry on an element-by-element basis." *Id.* at 40. Furthermore, every element in the patent must have an equivalent in the accused device; no limitation may be read out of the claims. *Id.* at 20.

As to the second step, a utility product patent is infringed if, "in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it will be the other." *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1335 (Fed. Cir. 2015). The patentee must prove infringement by a preponderance of the evidence. *Id.* Any differences must be evaluated in the context of the claimed design as a whole, not in the context of separate elements in isolation. *Id.* An element-by-element comparison at this step is improper. *Id.*

Based on the well-pleaded factual allegations in the Complaint, Avus has established the Patent is valid, having been issued on April 7, 2009. (ECF No. 1 ¶ 7.) Grezxx has no license or authority to use the Patent. (*Id.*) The Complaint's well-pleaded

allegations also establish Grezxx manufactures, designs, offers for sale, and sells accused Infringing Products. *See* 35 U.S.C. § 271(a). (ECF No. 1 ¶26.)

The Complaint alleges Grezxx's infringing products infringe on claim 1 of the patent either literally or under the doctrine of equivalents. (*Id.* ¶26.) The Patent document describes claim 1 as follows:

> A weight retention collar for securing weight plates to a barbell, comprising of: an outer frame that is shaped to form an interior space sufficient to allow the placement of said barbell therein, said frame having a first side and a second side; a plurality of pressure pins that are that are substantially cylindrical in shape, each of said pressure pins having a first side and a second side, said first side of each pressure pins being attached to the interior of said first side of said outer frame and said second side of each said pressure pins being attached to the interior of said second side of said outer frame; a pull bar connected to one of said plurality of pressure pins; and a level attached to said pull bar; wherein when said lever is activated to pull on said bar, said pressure pins close said outer frame against said barbell.

(ECF No. 1-1 at 10.)

The Complaint alleges the Infringing Product is a retention collar which includes an outer frame, which forms an interior space for surrounding a barbell to secure weights in place. (ECF No. 1 at 7.) The Infringing Product includes substantially cylindrical pressure pins attached to a frame, a pull bar attached to one such pressure pin, and a lever that, when pulled, causes the pressure pins to close the outer frame. (*Id.* at 7–8.)

Properly constructing the claim giving the meaning it naturally holds to a "person of ordinary skill in the art," the Court is not convinced Avus has established literal infringement under the standards articulated in *Netgear, Inc.* For instance, the claim indicates there is a "first side and second side" to the outer frame. (ECF No. 1-1 at 10.) The well-pled allegations in the Complaint only establish the Infringing Product has an outer

frame. (ECF No. 1 ¶32.) Another example is the claim stating the pressure pins are attached to the interior of the outer frame. (ECF No. 1-1 at 10.) The Complaint's allegations do not establish where the pressure pins attached to the outer frame of the Infringing Product. (ECF No. 1 ¶32.) While Avus tries to generalize the operation of the products covered by the Patent in the Complaint (*see id.* ¶27), that is not how the Court must construct the claim under step one of its analyses. *See Cybor Corp.* 138 F.3d at 1454. Given some elements are absent from the Infringing Product—or at least not alleged—the Court finds the Complaint does not make out a sufficient claim for literal infringement. *Netgear, Inc.*, 5 F.Supp.3d at 602.

However, Avus' Complaint establishes a claim for infringement under the doctrine of equivalents. *See Warner-Jenkinson*, 520 U.S. at 21, 29. Conducting an objective inquiry on an element-by-element basis, the Court finds any differences between the claim as properly constructed and the Infringing Product are insubstantial. Both products are weight retention collars that contain outer frames that form an interior space for surrounding a barbell to secure weights in place. (ECF No. 1 at 32.) Both contain substantially cylindrical pressure pins attached to the frame, a pull bar, and a lever that when pulled cause the pressure pins to close to the outer frame. (*Id.*) Even if every single element is not identical, the Court finds the elements of the products covered by the Patent and the Infringing Products are equivalent. *See Warner-Jenkinson*, 520 U.S. at 21, 29.

Under the second step of its analysis, the Court finds the Complaint sufficiently establishes through "in the eye of an ordinary observer" the two designs are substantially the same. *Ethicon Endo-Surgery, Inc.*, 796 F.3d 1312, 1335 (Fed. Cir. 2015). This can be

best illustrated through the illustrations in the Complaint. The products covered by the patent are shown below:



(ECF No. 1 ¶17.) The Infringing Product is virtually identical:



(*Id.* ¶18.)

As seen through the eyes of an ordinary observer giving such attention as a purchaser usually gives, the two designs are substantially the same. As such, the Court finds Avus has established a claim for infringement under the doctrine of equivalents.

### D.    Damages

Having found Avus has a claim for infringement under the doctrine of equivalents, the Court must ascertain damages prior to entering default judgment.

Under the Patent Act, upon finding for the claimant, a court shall award damages adequate to compensate for the infringement, together with interest and costs fixed by the court. *See* 35 U.S.C. § 284. When damages are not found by the jury, the court shall assess them, and may increase the damages up to three times the amount found or assessed. *Id.* In no event may damages be less than a reasonable royalty for the use of made of the invention by the infringer. *Id.* There are two categories of infringement compensation: (1) patentee's lost profits; and (2) a reasonable royalty the patentee would have received through arms-length bargaining. *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). The party alleging damages has the burden of proof, and damages must be proven by more than mere speculation. *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 29 (Fed. Cir. 2012)

A patentee may be entitled to lost profits as actual damages if it can prove "it would have made additional sales *but for* a defendant's infringement." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1284 (Fed. Cir. 2017) (emphasis added). Specifically, a patentee must establish: (1) demand for the patented product; (2) absence of acceptable non-infringing alternatives; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit it would have made. *Id.* at 1285. Frequently, the patent owner and infringer are the only suppliers in the market, and the owner is looking to recover profits lost through every sale made by the infringer. *See State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577 (Fed. Cir. 1989).

In the alternative, a court may apply a reasonable royalty calculation of damages if actual damages cannot be adequately proved. *Applied Med. Res. Corp. v. U.S. Surgical*

*Corp.*, 435 F.3d 1356, 1361 (Fed. Cir. 2006). "A reasonable royalty is the amount that a person, desiring to manufacture, use, or sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make, use, or sell the patented article, in the market, at a reasonable profit." *Id.* (quoting *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568 (Fed. Cir. 1984)) (cleaned up). The purpose of the reasonable royalty is to determine the amount necessary to adequately compensate for infringement. *Id.* If an established royalty does not exist, a court may determine a royalty based on "hypothetical negotiations between willing licensor and willing licensee" occurring at the time infringement began. *Id.* (citing *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1079 (Fed. Cir. 1983)).

There are numerous evidentiary facts for a district court to consider in the hypothetical negotiation context, including:

> 1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.
>
> 2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.
>
> 3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.
>
> 4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.
>
> 5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7. The duration of the patent and the term of the license.

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee— who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention— would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970);

*see also Lucent Tech.*, 580 F.3d at 1325 (adopting and utilizing the *Georgia-Pacific*

framework). The court has a broad range of discretion to evaluate the relevant factors. *Georgia-Pacific*, 318 F.Supp at 1120.

Further, there is a six-year temporal limit on damages under 35 U.S.C. § 286, and infringers must have actual or constructive notice of the patent. 35 U.S.C. § 287. Constructive notice may be given to all by:

> [E]ither by fixing thereon the word 'patent' or the abbreviation 'pat.', together with the number of the patent, or by fixing thereon the word 'patent' or the abbreviation 'pat.' together with an address of a posting on the Internet, accessible to the public without charge for accessing the address, that associates the patented article with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

35 U.S.C. § 287(a).

A hearing was held on November 4, 2022, at which Avus presented evidence in support of its damages claim. Dylan Jones ("Mr. Jones"), representing Avus, testified he estimated Grezxx sales represented approximately 50% of the total barbell collar sales on Amazon. (ECF No. 18 at 30.) Other knock-off companies represented approximately 45% of barbell collar sales, and only 5% of barbell collar sales on Amazon were legitimate. (*Id.*) Mr. Jones also testified if all infringers were removed from Amazon, Avus' market share would be between 80–90% of sales on the platform. (*Id.* at 31) Mr. Jones admitted given his market estimations, a sale *not* made by Grezxx is not guaranteed to go to Avus. (*Id.* at 30.)

Based on the record—including Mr. Jones' testimony—Avus cannot establish "it would have made additional sales *but for* a defendant's infringement." *Mentor Graphics Corp.* 851 F.3d at 1284. Specifically, Avus offers little evidence of the absence of non-infringing alternatives, or that Grezxx and Avus are the only producers of barbell collars in the market. *See Mor-Flo Indus., Inc.*, 883 F.2d at 1577. To the contrary, Mr. Jones testified he could not specifically say any sale not made by Grezxx would go to Avus, and by estimating 80-90% of the sales on Amazon would go to Avus if *all* infringing products were removed, it necessitates at least one in ten sales would go elsewhere. Compounded with the fact all of Avus' product data focuses on sales on a single platform—Amazon—and ignores other outlets for obtaining non-infringing products, the Court cannot conclude Avus is entitled to recover lost profits damages.

In the absence of proof to support an award of damages based on lost profits, the Court is left to calculate damages based on a reasonable royalty. At the hearing, Mr. Jones testified as follows:

> Q: (BY THE COURT) What is the royalty that would have typically been collected had this product been licensed? So bottom line is, is if you were to allow or license another -- I understand you would do the manufacturing, but what would be your typical margin that you would collect in those scenarios?
>
> A. [MR. JONES] Somewhere around 10 percent would be fair value.
>
> Q. And 10 percent on the ultimate end sales price?
>
> A. Yeah, 10 percent on the revenue generated.
>
> MR. EMERY: The gross revenue or the net?
>
> THE WITNESS: The gross. 10 percent of gross. It's a bit easier to calculate than net.

MR. EMERY: So if it was on Amazon, that would be the $30, roughly?

THE WITNESS: Yes.

Q. (BY THE COURT) All right. And then you would collect 10 percent of that?

A. Right, correct.

(ECF No. 19 at 5.) Given Mr. Jones' testimony—and lack of contradictory evidence—the Court sees no reason to depart from 10 percent royalty under the *Georgia-Pacific* framework. The final two inquiries in determining damages are therefore: (1) when did Grezxx have actual or constructive notice of infringement so to begin accrual of damages; and (2) what were Grezxx's gross sales over the infringing period?

The first question is seemingly quickly answered. Avus' products covered by the Patent have the word "PATENT" printed on the underside of the lever followed by the full patent number. (*See* ECF No. 20-1.) Under statutory law, this is sufficient to give constructive notice to all. *See* 35 U.S.C. § 287(a). Mr. Jones attested products covered by the Patent have been marked since 2016, which would potentially cover the full six-year temporal limitation on damages. (ECF No. 20-1 at 1.) However, for the reasons explained below, the Court need not definitively establish a date of notice based on these facts.

Establishing the date of notice for Grezxx is complicated by facts apparent in public records neither contemplated nor explained by Avus.[10] Grezxx's initial LLC filing,

---

[10] The Court is permitted to take judicial notice of facts which are a matter of public record. *See St. Louis Baptist Temple. Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979).

accessible through the Wyoming Secretary of State's website,[11] indicates it was organized on December 2, 2021. While the evidence presented by Avus purports to show Grezxx made Infringing Products available starting November 29, 2015 (*see* ECF No. 17-3 at 3), that date appears tied to the individual product's Amazon Standard Identification Number ("ASIN"). So, while the product tied to the ASIN may have been available starting in November 2015, it does not establish Grezxx was selling the product on that date. Indeed, while *someone* was selling an Infringing Product on that date, Grezxx could not have conceivably done so until their date of organization. Given the date of organization and the constructive notice established by Avus, the Court finds the applicable date of notice to be December 2, 2021.

As to the second question, Avus estimates approximately 869,366 Infringing Products tied to the ASIN have been sold since it's date of availability—November 29, 2015. This is based on the total number of Amazon reviews the Infringing Product received and data from industry experts estimating only around 3% of customers leave reviews.[12] Given the somewhat speculative nature of the calculation, the Court is inclined to conservatively estimate 5% of purchasers left a review, resulting in 521,620 total Infringing Products sold. Taking this baseline estimate of 521,620 Infringing Products sold over an approximately seven-year period—from November 2015 to November 2022—the Court will postulate the sales were made evenly year over year, a net of 74,517 infringing sales

---

[11] *See supra*, note 1.
[12] Specifically, Avus noted the Infringing Products received 26,081 global ratings on Amazon.com, which indicated 869,366 total units sold if 3% of purchasers left ratings. (ECF 13-1 at 8.)

per year. Given these figures are rough estimations, the Court finds 75,000 infringing sales occurred since the Grezxx's date of notice.

Finally, based on Mr. Jones' testimony that Avus would likely only license the product if it did the manufacturing—and therefore resulting in a reasonable end sales price of approximately $30.00—the Court concludes Avus would collect a $3.00 royalty per unit had it engaged in a hypothetical negotiation with a willing licensee. *Applied Med. Res. Corp.* 435 F.3d at 1361 Applying the royalty to the Court's estimation of 75,000 Infringing Products sold, the Court finds Avus is entitled to $225,000 in reasonable royalty damages.

Avus' Complaint also seeks an award of both prejudgment and post-judgment interest. (ECF No. 1 at 9.) The Supreme Court has held prejudgment interest should ordinarily be awarded in patent infringement cases. *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655 (1983); *see* 35 U.S.C. § 284. Typically, "prejudgment interest should be awarded from the date of [the] infringement to the date of the [the] judgment." *Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1076 (Fed. Cir. 2020). This includes applying interest to a lump-sum damages award beginning the first date of the infringement. *Id.*

Absent any argument to the contrary, the Court will apply the Wyoming statutory rate to the damages award. *Id.* (citing *Comcast IP Holdings I LLC v. Sprint Commc'ns Co., L.P.*, 850 F.3d 1302, 1315 (Fed. Cir. 2017)); *Youngs v. Am. Nutrition, Inc.*, 537 F.3d 1135, 1146 (10th Cir. 2008) (prejudgment rate is controlled by state law). Per Wyoming statute, the appropriate measure of prejudgment interest is 7% per annum. *Lew v. Lew*, 449 P.3d 683, 688 (Wyo. 2019) (citing WYO. STAT. § 40-14-106(e)). Applying this rate, the Court

awards $15,750 in prejudgment interest.[13] Avus is further entitled to post-judgment interest at a rate of 4.76%, equating to $29.34 per day.[14] *See Youngs*, 537 F.3d at 1146; 28 U.S.C. § 1961(a).

In sum, the Court finds Avus is entitled to damages in the amount of $225,000, prejudgment interest in the amount of $15,750, and post-judgment interest at a rate of 4.76% (equating to $29.34 per day).

### E.    Enhanced Damages

As previously noted, the court has the discretion to increase the damages "up to three times the amount found or assessed." 35 U.S.C. § 284; *see Sunoco Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 32 F.4th 1161, 1177 (Fed. Cir. 2022). "As the Supreme Court explained, '[t]he sort of conduct warranting enhanced damages has been variously described . . . as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate.'" *Id.* (quoting *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103–04 (2016). Stated differently, "such damages are generally reserved for egregious cases of culpable behavior." *Id.* (quoting *Halo*, 579 U.S. at 104).

Here, Avus presents little to no evidence of "willful, wanton, [or] malicious" behavior "characteristic of a pirate" by Grexx to warrant an award of enhanced damages.[15] As such, the Court will not award enhanced damages in this case.

---

[13] Infringement began on December 2, 2021, and judgment is hereby entered on December 2, 2022. $225,000 x .07 = $15,750.00.

[14] $225,000 x .0476 = $10,710. $10,710 / 365 days = $29.34 per day.

[15] This is somewhat perplexing because at the hearing, Mr. Jones testified he sent numerous emails to Grexx regarding infringement (ECF No. 18 at 34–35), and Grexx had responded indicating they were "doing nothing wrong "(*Id.* at 21). The Court advised Avus to supplement the record "with any written and/or other communication" in part because it could go to the issue of willfulness of the violation. (*Id.* at

### F.      Attorneys' Fees

Avus' Complaint seeks an award of reasonable attorney's fees. (ECF No. 1 at 9.) In a patent infringement action, the court in "exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. The Supreme Court has held a "exceptional case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). District courts may use their discretion to determine whether a case is "exceptional," considering the totality of the circumstances. *Id.* Factors such as frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence may be relevant to this determination. *Id.* at n.6 (citing *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)).

Here, Avus makes no argument as to why this is an exceptional case warranting an award of attorneys' fees. As such, the Court finds an award of such fees in not appropriate.

### G.      Injunctive Relief

Under the Patent Act, courts having jurisdiction over patent infringement cases may grant injunctions in accordance with the principle of equity to prevent the violation of any right secured by a patent, on such terms as the court deems reasonable. *See* 35 U.S.C. § 283. In order for a court to issue a permanent injunction under the Patent Act, a plaintiff

---

35.) In its supplement, Avus included no such correspondence. Rather, Avus seems to concede they are not seeking enhanced damages. (ECF No. 20 at 4.)

must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). The decision to grant or deny an injunction rests within the equitable discretion of the district court. *Id.* Courts have traditionally granted injunctive relief upon a finding of infringement in the vast majority of patent cases. *Id.* at 395 (Roberts, C.J. concurring; Scalia, J. and Ginsburg, J. joining); *see also Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1233 (Fed. Cir. 1985) ("If monetary relief were the sole relief afforded by the patent statute then injunctions would be unnecessary and infringers could become compulsory licensees for as long as the litigation lasts"). An injunction must be narrowly tailored to remedy the harm shown. *ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 752 (10th Cir. 2011).

When considering the first factor, evidence of head-to-head competition and lost market share tend to evidence irreparable harm. *J&M Indus., Inc. v. Raven Indus., Inc.*, 574 F.Supp.3d 941, 957 (D. Kan. 2021) (citing *TEK Global, S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 793 (Fed. Cir. 2019). Other factors pointing to irreparable injury including price erosion, loss of goodwill, damage to reputation, and loss of business opportunities. *Id.* (quoting *Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1304 (Fed. Cir. 2013)).

Under the second factor, harm such as loss of market share and "difficulty in estimating monetary damages" are evidence monetary damages are inadequate to

compensate for the injury. *Id.* (quoting *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010)). A patentee not licensing the patent to a non-affiliated company may also serve as evidence of the inadequacy of monetary damages. *Id.* Further, evidence the infringer will not cease absent an injunction weigh in favor of issuance. *See Robert Bosch, LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155 (Fed. Cir. 2011) (citing *Reebok Int'l, Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1557 (Fed. Cir. 1994) (recognizing future infringement may have market effects never fully compensable in money)). The availability and probability of monetary payments may also be a consideration under this factor. *Id.*

In considering the balance of hardships under the third factor, "courts may consider the parties' sizes, products, and revenue sources." *J&M Indus., Inc.*, 574 F.Supp.3d at 957 (quoting *Bio-Rad Labs, Inc. v. 10X Genomics, Inc.*, 967 F.3d 1353, 1378 (Fed. Cir. 2020)). Yet, a party may not escape an injunction simply because it is smaller or because its primary product is an infringing one. *Robert Bosch, LLC*, 659 F.3d at 1156.

Finally, "the touchstone of the private interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects." *J&M Indus., Inc.*, 574 F.Supp.3d at 957 (quoting *Bio-Rad Labs*, 967 F.3d at 1379). Without evidence of adverse effects, the public interest is generally served by enforcing valid patents. *Otter Products, LLC v. FreeCo, Inc.*, No. 10-cv-02028-LTB, 2011 WL 1542150, at *4 (D. Colo. Apr. 25, 2011); *see also Wesley Jessen Corp. v. Bausch & Lomb, Inc.*, 209 F.Supp.2d 348, 404 (D. Del. 2002) (noting often in cases where courts have declined to grant injunctions, the issuance would have had severe medical or environmental consequences).

38

Here, the Court finds it appropriate to permanently enjoin Grezxx from manufacturing, selling, or offering to sell Infringing Products. Under the first factor, Avus has demonstrated irreparable injury. According to Mr. Jones' testimony, Avus currently maintains around 5% of the market share of barbell collar sales on Amazon. (ECF No. 18 at 27.) He estimated if all infringers—including Grezxx—were removed from Amazon.com, Avus' market share would increase to 80 or 90%. (*Id.* at 31.) Especially considering lost profits damages are not available to Avus in this case,[16] it is apparent Avus has been irreparably harmed. Further factors indicating irreparable harm are also present. For instance, Avus has established they compete head-to-head with Grezxx (*Id.* at 29–30) and have lost market share because of the infringement (*Id.* at 31). The Court therefore concludes Avus has been irreparably harmed as a result of Grezxx's infringement.

Under the second factor, as should be apparent from the Court's damage calculation, there is a significant difficulty in accurately estimating monetary damages in this case. *i4i Ltd.*, 598 F.3d at 862. Further, Mr. Jones' testimony that Grezxx did not believe they "were doing anything wrong" by selling infringing products counsels towards issuing an injunction. (ECF No. 18 at 21.) Given Grezxx's lack of participation in this lawsuit, the Court questions the likelihood of Avus collecting monetary payments in the future. The Court finds monetary damages are inadequate to compensate for Avus' injuries in this case.

Although direct evidence supporting the third factor is limited, Mr. Jones did testify that Grezxx sales represented approximately 50% of the market share on Amazon, largely

---

[16] See *supra*, part D.

because of their ability to undercut the market. (*Id.* at 30.) Further, he testified Grezxx represented the largest volume seller of knock-off barbell collars in the United States. (*Id.* at 14.) This testimony indicates Grezxx is of sufficient size so that an injunction would not be unduly burdensome. As previously discussed, Avus has likely realized a significant reduction in sales because of Grezxx's infringing activity. Considering the balance of hardships, the Court determines a remedy in equity is warranted in this case.

Finally, the fourth factor strongly counsels towards granting an injunction. There is not a scintilla of evidence indicating the public interest would *not* be best served by enforcing a valid patent in this case. *See Otter Products, LLC*, 2011 WL 1542150, at *4.

The Court therefore finds a permanent injunction is warranted in this case and will enjoin Grezxx as described in the conclusion of this Order.

### F.    Amazon Marketplace Account

As a final matter, Avus' motion for default judgment requests the Court order Amazon to transfer all assets in Grezxx's merchant account in order to satisfy the judgment. (ECF No. 12 at 9.)

A permanent injunction may only bind: (1) the parties, the parties' officers, agents, servants, employees, and attorneys, and other persons in active concert or participation with any of the aforementioned persons; (2) who receive actual notice of the injunction by personal service or otherwise. *See* Fed. R. Civ. P. 65(d)(2). Supreme Court precedent generally forecloses pre-determination of whether an injunction binds a third party without first giving it notice and an opportunity to be heard. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 110–11 (1969).

As Avus' counsel conceded at the hearing, Amazon is not a party to this suit, and the Court has no power to bind it through an injunction without notice and an opportunity to be heard. Avus advances no further argument nor cites any authority allowing this Court to order Amazon to turn over the contents of Grezxx's marketplace account at this stage. As such, the Court declines to take such action at this time.

## CONCLUSION AND ORDER

**IT IS THEREFORE ORDERED** pursuant to Fed. R. Civ. P. 55(b) the *Redacted Motion for Default Judgment* (ECF No. 9) filed by Plaintiff Avus Designs, Inc. is hereby **GRANTED.**

**IT IS FURTHER ORDERED** Avus is hereby awarded damages in the amount of $225,000, prejudgment interest in the amount of $15,750, and post-judgment interest at a rate of 4.76% (equating to $29.34 per day).

**IT IS FURTHER ORDERED** Avus' request for a permanent injunction is granted as follows:

Grezxx, LLC, a Wyoming limited liability company, its officers, agents, servants, employees, attorneys, and all other persons or entities acting in concert or participation with the aforementioned persons are immediately enjoined:

1. From making, using, selling, or offering for sale, any product incorporating the invention claimed in U.S. Patent No. 7,513,856, or any colorable imitation thereof, including but not limited to the following Universal Product Code (UPC) numbers:

634458702140

41

634458702157
665355861401
634458702133
665355861357
634458705325
665355861388
634458704304
665355861395
634458702126
665355861371
634458704298

2. From further acts of infringement of U.S. Patent No. 7,513,856.

IT IS SO ORDERED.

Dated this 2nd day of December, 2022.

_____
Scott W. Skavdahl
United States District Judge